[Civ. No. 56736. Second Dist., Div. Two. July 3, 1980.]

SULLY-MILLER CONTRACTING COMPANY, Petitioner, v. WORKERS' COMPENSATION APPEALS BOARD and HAROLD A. SOMMER, Respondents.

COUNSEL

Jones, Nelson, Sisk & Ford and Jack Sisk for Petitioner.

Richard W. Younkin, William B. Donohoe, Dexter W. Young, Rose, Klein & Marias and Ronald Feenberg for Respondents.

OPINION

ROTH, P. J.—Petitioner Sully-Miller Contracting Company (Sully-Miller) seeks review of the decision of the respondent Workers' Compensation Appeals Board (Board) wherein the Board denied the petition by Sully-Miller to reopen to reduce the workers' compensation permanent disability indemnity award to respondent injured employee, Harold A. Sommer. We conclude the Board erred in denying Sully-Miller's petition to reopen.

*Proceedings Before Appeals Board*

Sommer (hereinafter also applicant) while employed as a heavy duty equipment operator by Sully-Miller during the period January 1973 through August 26, 1976, sustained injury arising out of and occurring in the course of said employment to his pulmonary system in the form of coccidioidomycosis granuloma (commonly called San Joaquin Valley Fever).

Sully-Miller voluntarily provided medical care and temporary disability benefits. Sommer was on temporary disability for approximately six months. During the course of medical treatment for the industrial injury herein, Sommer underwent a left tube thoracostomy; in this operation a catheter was temporarily inserted into the pleural cavity through a small skin incision in order to drain off fluid. Since this surgical procedure Sommer has complained of pain in the chest at the site of the thoracostomy.

Initially, Sommer returned to his regular work but complained of chest pain when operating heavy equipment. After about a month and a half, Sommer became a construction foreman and in such capacity he does not have to operate any heavy equipment.

Both the treating physician, Jeffery D. Aaronson, M.D., (a specialist in internal medicine and pulmonary disease) and Sommer's medical-legal consulting specialist in internal medicine, Edward M. Schneider, M.D., opined that Sommer's discomfort was "post-op intercostal neuritis left chest with residual paresthesia and hyperesthesia." Dr. Schneider felt that Sommer "can expect very little, if any, resolution of his pain" and concurred with the view that "this pain is sufficiently severe so that it restricts his activity and would limit his ability to ride the stiff riding, sophisticated, construction equipment." Dr. Aaronson described the discomfort "as a sharp pulling or stretching sensation and increases with deep inspiration and with exertion such as lifting."

Dr. Schneider evaluated Sommer's permanent disability as "disability precluding heavy work to disability resulting limitation to light work."[1]

Reporting on behalf of Sully-Miller, Frank Dituri, M.D., a specialist in internal medicine, evaluated Sommer on several occasions. In his report of December 27, 1977, Dr. Dituri stated as to permanent disability: "The only residual disability Mr. Sommer has is related to the intercostal neuritis from the placement of the thoracotomy tube. As a result of the intercostal neuritis he has a subjective complaint of pain in the left chest on certain work activities. This condition has gotten no worse, and may have gotten slightly better in the past year. It is permanent and stationary. It is not a basis for placing any physical limitations on the

---

[1] A disability precluding heavy work "contemplates the individual has lost approximately half of his pre-injury capacity for performing such activities as bending, stooping, lifting, pushing, pulling, and climbing or other activities involving comparable physical effort." (Schedule for Rating Permanent Disabilities under provisions of the Labor Code of the State of California (hereinafter Rating Schedule), Guidelines for Work Capacity, par. e; see *Johns-Manville Products Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 87 Cal.App.3d 740, 750-751, fn. 6 [151 Cal.Rptr. 215]; 1 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d rev. ed. 1980) § 11.02 [3]; 1 Herlick, Cal. Workers' Compensation Law Handbook (2d ed. 1978) § 7.32, pp. 237-241; Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) § 15.17, pp. 540-543; St. Clair, Cal. Workers' Compensation Law and Practice (1980) § 8.5, pp. 138-141.)

A disability resulting in limitation to light work "contemplates the individual can do work in a standing or walking position, with a minimum of demand for physical effort." (Rating Schedule, Guidelines for Work Capacity, par. f.)

A preclusion from heavy work is a 30 "standard rating;" a limitation to light work is a 50 "standard rating." "Standard rating" refers to the permanent disability rating before adjustment for age and occupation. (See Lab. Code, § 4660, subd. (a); 1 Hanna, *op. cit. supra*, § 11.03; 1 Herlick, *op. cit. supra*, §7.34-7.37; Cal. Workmen's Compensation Practice, *op. cit. supra*, § 15.18-15.25; Welch, Fundamentals For Applying Cal. Schedule for Rating Permanent Disabilities (1975) pp. 3-6.)

man....[¶] It is my opinion that Dr. Aaronson summarized it quite well when he stated in his report that this is something the man will have to learn to live with. The important thing is that he not be given the false notion that he will be doing himself harm by doing physical activity. He should be reassured that the more he ignores the pain, the more quickly it will diminish and be less of a problem."

At the hearing of March 10, 1978, Sommer testified that he was unable to operate heavy construction equipment as the "jumping up and down or the movement that is present in operating equipment" creates a lot of pain in his left side. According to Sommer, the operation of heaving construction equipment requires use of the arms and upper torso and this exacerbates his symptoms.

The workers' compensation judge found that as a result of the industrial injury to the pulmonary system-chest Sommer had a permanent disability "within the limitation of no heavy work to light work." The disability evaluation specialist (hereinafter rater) recommended a permanent disability rating of a 40 standard rating which adjusted for age and occupation (*ante*, fn. 1) to 43 1/2 percent permanent disability. The judge awarded Sommer 43 1/2 percent permanent disability indemnity in accord with the rater's recommendation.[2]

The Board denied reconsideration of this award.

In the proceedings directly under review, Sully-Miller sought reopening of Sommer's case in order to reduce the permanent disability award. (Lab. Code, §§ 5803, 5804.)[3] The basis of the reopening is surveillance

---

[2]A 43 1/2 percent permanent disability rating entitles Sommer to $14,122.50 payable at $70 per week.

[3]Labor Code section 5803: "The appeals board has continuing jurisdiction over all its orders, decisions, and awards made and entered under the provisions of this division. At any time, upon notice and after an opportunity to be heard is given to the parties in interest, the appeals board may rescind, alter, or amend any such order, decision, or award, good cause appearing therefor.

"Such power includes the right to review, grant or regrant, diminish, increase or terminate, within the limits prescribed by this division, any compensation awarded, upon the grounds that the disability of the person in whose favor such award was made has either recurred, increased, diminished, or terminated."

Labor Code section 5804: "No award of compensation shall be rescinded, altered, or amended after five years from the date of the injury except upon a petition by a party in interest filed within such five years and any counterpetition seeking other relief filed by the adverse party within 30 days of the original petition raising issues in addition to those raised by such original petition. Provided, however, that after an award has been

film of Sommer which (it is argued by Sully-Miller) demonstrates Sommer is not disabled and the report of Dr. Dituri which concludes that the surveillance film verifies that Sommer is not disabled. As described by the judge in the summary of evidence: "In the films applicant [Sommer] was observed climbing on a high type chair and hammering. He was observed reaching overhead. He was then observed climbing a short ladder that consisted of three rungs. He climbed as high as the third rung on occasion. He was seen using a power drill for drilling. He helped carry what appeared to be four-by-[sixes] with assistance of another individual. He picked up what appeared to be a heavy piece of equipment which apparently was some kind of power saw which he used to make diagonal cuts on the four-by-[sixes]. Some of his work was done in a slightly crouched position. He was seen lifting four-by-[sixes] overhead with the help of another individual. [¶] At the baseball field he would take up a crouch position while he was umpiring. He also did some running. He was observed throwing and catching a baseball and batting flies and grounders purportedly to players in the field."

The film of the patio construction was 250-300 feet in length and lasted about 20 minutes; the baseball field film was 150 feet and ran about 10 minutes.

In his report of July 10, 1978, Dr. Dituri states that the surveillance film demonstrates the correctness of his previous opinion that Sommer "is perfectly capable of unlimited physical activity without limitation."

The petition to reopen came for hearing on March 5, 1979. At the hearing Sully-Miller had admitted into evidence the medical report of Dr. Dituri dated July 10, 1978, and the surveillance film. The investigator who took the film testified to authenticate the film. The investigator testified that he observed Sommer at the patio construction site and the baseball field for approximately three hours at each location but did not film all of Sommer's activities but only what the investigator believed to be a cross-section of Sommer's activities at each location.

Sommer offered no evidence in direct rebuttal to Dr. Dituri or with regard to the surveillance film. All that Sommer testified to was that

---

made finding that there was employment and the time to petition for a rehearing or reconsideration or review has expired or such petition if made has been determined, the appeals board upon a petition to reopen shall not have the power to find that there was no employment."

his job duties (as a foreman) and physical complaints were unchanged from the last time he testified in March 1978.

The judge denied the petition to reopen, discounting both the surveillance film and Dr. Dituri's report of July 10, 1978. In his opinion on decision, the judge stated in pertinent part: "The films were observed by the Court and the applicant's activities depicted therein duly noted. None of the physical activities filmed was for any prolonged period of time and each was done in a leisurely, unhurried manner. The Court was not convinced that the 30 minutes of filmed activities observed were inconsistent with the limitations of the disability previously found. The applicant testified that there has been no change in his physical complaints about which he testified on 3/10/78.

"The report of Dr. Dituri dated 7/10/78, was carefully reviewed. Dr. Dituri, at request of [Sully-Miller], previously submitted reports in this matter dated 11/1/76, 1/26/77, 7/6/77, and 12/27/77, in which he disagreed with the opinions of Dr. Schneider and Dr. Aaronson regarding limitations resulting from disability. His 7/10/78, report covering examination of the applicant on 6/26/78, after he had reviewed the motion picture films...on 6/19/78, and his questions of an equivocal nature put to the applicant regarding performance of activities of the type seen in the films impresses the Court as amounting to what Dr. Dituri considers to be vindication of his earlier views which had been considered and rejected by the Court.

"At the outset, the Court in this matter does not deem Dr. Dituri to be a wholly disinterested, objective witness. It should be noted that Dr. Dituri's last examination of applicant took place one month after the activities depicted in the films. At page 3 of his report, Dr. Dituri sets forth the interrogation to which he subjected applicant regarding the type of activities observed in the films. It is noted that the Doctor asked applicant whether he had *recently* done certain things, which, according to the Doctor applicant 'vigorously denied.' The Doctor therefore concluded 'There was a marked discrepancy between his answers and what I observed in the films...'

"Considering that the type of questions Dr. Dituri put to the applicant had no specific time frame and that there was a lapse of more than one month from the time the films were taken, the Court cannot escape the conclusion that Dr. Dituri was more concerned with discrediting the

applicant than arriving at the facts. Unless there is certainty that the applicant understood that something which may have occurred more than one month earlier was 'recent', there is reasonable doubt whether his answers in the negative as recorded by Dr. Dituri were false, inaccurate or discrepant.

"The Court in its own independent evaluation of the significance of which appears in the motion picture films finds no convincing evidence that applicant's disability has diminished from that initially found. Accordingly, [Sully-Miller's] Petition to Reopen is denied."

Clarifying his position on the import of the surveillance film, the judge stated in his report on Sully-Miller's petition for reconsideration: "Insofar as the so-called 'cross-section' of activities claimed to be filmed, the court considered this to refer to a composite of the various activities observed at the highest level of exertion and total duration thereof. Notwithstanding six hours of surveillance only a total of 30 minutes of noncontinuous activity are presented in the films. This was not considered depiction of protracted activities by the applicant inconsistent with the disability initially found."

The Board denied reconsideration, affirming the judge's denial of Sully-Miller's petition to reopen and the judge's award of attorneys fees against Sully-Miller.[4]

*Discussion*

■ "We must determine whether the evidence, when reviewed in the light of the entire record, (*Redner* v. *Workmen's Comp. Appeals Bd.*, 5 Cal.3d 83 [95 Cal.Rptr. 447, 485 P.2d 799]; *Lamb* v. *Workmen's Comp. Appeals Bd., supra*, 11 Cal.3d 274 [113 Cal.Rptr. 162, 520 P.2d 978]) supports the award. 'The foregoing standard is not met "by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence."' (*Lamb* v. *Workmen's Comp. App. Bd., supra*, at p. 281; *Garza* v. *Workmen's*

---

[4]Labor Code section 5410.1 provides: "Should any party to a proceeding institute proceedings to reduce the amount of permanent disability awarded to an applicant by the appeals board and be unsuccessful in such proceeding, the board may make a finding as to the amount of a reasonable attorney's fee incurred by the applicant in resisting such proceeding to reduce permanent disability benefits previously awarded by the appeals board and assess the same as costs upon the party instituting the proceeding for the reduction of permanent disability benefits."

*Comp. App. Bd.*, 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451]; *Greenberg* v. *Workmen's Comp. Appeals Bd.*, 37 Cal.App.3d 792 [112 Cal.Rptr. 626].)" (*Universal City Studios, Inc.* v. *Workers' Compensation Appeals Board* (1979) 99 Cal.App.3d 647, 656 [160 Cal.Rptr. 597].)

We are here not reviewing the original award of 43 1/2 percent permanent disability indemnity, which has long since become final. (Lab. Code, § 5950; *Aliano* v. *Workers' Comp. Appeals Bd.* (1979) 100 Cal. App.3d 341, 364 [161 Cal.Rptr. 190].) ▮ All that is before this court for review is the Board's affirmance of the judge's decision denying Sully-Miller's petition to reopen. (*Aliano, supra,* 100 Cal.App.3d at pp. 364-365.) "Accordingly, the record of the original proceedings is not now before us for review as to the correctness thereof. That record may, however, be reviewed together with other matters in the present proceedings to determine whether there is good cause to reopen and our decision herein will be so limited." (*Walters* v. *Industrial Acc. Com.* (1962) 57 Cal.2d 387, 393 [20 Cal.Rptr. 7, 369 P.2d 703]; *Clendaniel* v. *Ind. Acc. Com.* (1941) 17 Cal.2d 659, 662 [111 P.2d 314]; *Aliano, supra,* 100 Cal.App.3d at p. 365.)

▮ We conclude that the Board's denial of Sully-Miller's petition to reopen must be annulled as the Board's decision is unreasonable and unsupported by substantial evidence. (*Universal City Studios, Inc., supra,* 99 Cal.App.3d 647.)

The judge's rationale for ignoring the surveillance film cannot withstand close analysis. The judge was unconvinced that the activities observed in the film were inconsistent with the limitation of disability previously found. Our review demonstrates to us that the activities illustrated in detail by the film show a relaxed and skilled worker performing in continuous activity which embraced "bending, stooping, lifting, pushing, pulling and climbing..." (see fn. 1) completely inconsistent with the disability as originally found. Most seasoned and skilled artisans perform at a pace which to the unskilled observer appears to be "leisurely and unhurried." In our opinion Sommer was working at a pace which would please any employer. One need only objectively examine the Rating Schedule's definition of a preclusion from heavy work and a limitation to light work (*ante,* fn. 1) to find that the surveillance film is completely inconsistent with and does not warrant the present disability rating unless the film is ignored. The film reveals Sommer engaged in construction work, repeatedly lifting, pushing, climbing a short

ladder, picking up a power saw and working with it, and working overhead. At the baseball field Sommer is seen running, throwing, catching and batting. At no time during these activities was Sommer seen to be in any way restricted or in discomfort. These activities are especially significant since Sommer here was restricted on the basis of subjective complaints, which Sommer claims limit his work activities.[5]

The second basis for discounting the film which was offered by the judge was that the film was not a true cross-section of Sommer's activities. The investigator who took the films testified *without contradiction* that the films represented a "true cross-section of what [Sommer] did during the day." Significantly, Sommer neither denied having engaged in the activities depicted in the film nor testified that the film did not depict a true cross-section of activities. Indeed, none of Sommer's testimony at the hearing of March 5, 1979, is directly in rebuttal to the film even though Sommer testified *after* the film was shown and admitted into evidence. The *mere argument* by Sommer's counsel that the film is not a "true cross-section" is not rebuttal evidence to the film and the investigator's testimony. (*Huston* v. *Workers' Comp. Appeals Bd.* (1979) 95 Cal.App.3d 856, 864 [157 Cal.Rptr. 355].) ██ Further, while neither the judge nor the Board should blindly accept evidence without carefully judging its weight and credibility (*Universal City Studios, Inc., supra*, 99 Cal.App.3d at pp. 660-661), "'[A]s a general rule, the Board *"must accept as true the intended meaning of [evidence] both uncontradicted and unimpeached."* (*LeVesque* v. *Workmen's Comp. App. Bd., supra*, 1 Cal.3d 627, 639 [83 Cal.Rptr. 208, 463 P.2d 432]; *McAllister* v. *Workmen's Comp. App. Bd., supra*, 69 Cal.2d 408, 413 [71 Cal.Rptr. 697, 445 P.2d 313]; see *Wilhelm* v. *Workmen's Comp. App. Bd., supra*, 255 Cal.App.2d 30, 33 [62 Cal.Rptr. 829].)' (*Garza* v. *Workmen's Comp. App. Bd., supra*, 3 Cal.3d 312, 317-318.) (Italics added.)" *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 281 [113 Cal.Rptr. 162, 520 P.2d 978].)[6] ██ Here, the film was in no way contradicted by any *evidence* offered by Sommer. The assumption must therefore be that the film depicts a true cross-section

---

[5]Contrary to Sommer's contention there is no basis to conclude that any physician restricted Sommer on a prophylactic basis because of having contracted coccidioidomycosis granuloma or to prevent further injury to him. The work restrictions were placed upon Sommer *solely* because of his alleged subjective complaints which purport to limit his work activity.

[6]The judge also criticizes the film as only 30 minutes of film was taken of total activities actually lasting about 6 hours. The shortness of the film would, of course, have left room for rebuttal by Sommer of the "true" nature of his activities that day.

of his activities. (*Westside Produce Co.* v. *Workers' Comp. Appeals Bd.* (1978) 81 Cal.App.3d 546, 552 [146 Cal.Rptr. 498].)

Sommer offered no medical evidence in rebuttal to Dr. Dituri as to the significance of the surveillance film. In rejecting this unrebutted evidence, the judge reasoned that Dr. Dituri's report was unpersuasive as Dr. Dituri's questioning of Sommer was suspect, Dr. Dituri was not a truly impartial expert witness, and the surveillance film of Sommer was in reality not truly depictive of Sommer's activities. As stated above, there is no evidentiary basis for discounting the film. Further, Sommer did not testify that Dr. Dituri's questioning of him had been misleading or Sommer's answers as recorded by Dr. Dituri were wrong. Dr. Dituri's opinion is thus unrebutted. In fact the film demonstrates that Dr. Dituri's opinion as to the nature of Sommer's injury (*ante*) and its prognosis was correct in its last two sentences: "The important thing is that he not be given the false notion that he will be doing himself harm by doing physical activity. He should be reassured that the more he ignores the pain, the more quickly it will diminish and be less of a problem." As to the *alleged* partiality of Dr. Dituri, if the evidence was in conflict this would be an important factor to weigh *if* partiality were indeed shown. Here, however, we must again stress, there is no conflict in the record.

We are well aware that Labor Code section 3202 enjoins us to construe the Workers' Compensation Act liberally in favor of injured employees. (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668 [150 Cal.Rptr. 250, 586 P.2d 564].) "This statute applies equally to 'the courts' and to the Workmen's Compensation Appeals Board (see *Beaida* v. *Workmen's Comp. App. Bd.* (1968) 263 Cal.App.2d 204, 208-209 [69 Cal.Rptr. 516]); it applies also to *factual* as well as statutory construction (see *Lundberg* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 436, 439 [71 Cal.Rptr. 684, 445 P.2d 300]), and any reasonable doubt whether a disability is compensable will be resolved in favor of the employee (see *Truck Ins. Exchange* v. *Ind. Acc. Com.* (1946) 27 Cal.2d 813, 816 [167 P.2d 705])." (*Hulbert* v. *Workmen's Comp. Appeals Bd.* (1975) 47 Cal.App.3d 634, 639 [121 Cal. Rptr. 239].) Labor Code section 3202, however, authorizes neither the creation of nonexistent evidence nor the creation of a conflict in the evidence which does not otherwise exist.

The denial of Sully-Miller's petition to reopen and awarding of attorneys fees against Sully-Miller were therefore erroneous. Sully-Miller's

petition to reopen should have been granted. Accordingly, the Board's decision is annulled and the matter remanded for such further proceedings as are consistent with our opinion herein.

Fleming, J., and Compton, J., concurred.