[Civ. No. 61228. Second Dist., Div. Two. July 10, 1981.]

NATIONAL CONVENIENCE STORES et al., Petitioners, v. WORKERS' COMPENSATION APPEALS BOARD and IRVING B. KESSER, Respondents.

COUNSEL

Zonni, Ginocchio & Taylor and Alan S. Freeman for Petitioners.

Ghitterman, Schweitzer & Associates, Allan S. Ghitterman and Martha Shaw for Respondents.

OPINION

**COMPTON, J.**—Irving B. Kesser (hereinafter also applicant) while on his second day of work, as a store manager/stock clerk for National Convenience Stores (National) allegedly suffered an industrial injury to his back, shoulder, arm, leg and psyche when he fell off a box. National is insured for purposes of workers' compensation by Houston General Insurance Company (General). We shall for convenience refer to National and General collectively as the employer.

The workers' compensation judge, whose decision was affirmed by the Workers' Compensation Appeals Board (WCAB) found that applicant sustained injury to the psyche, is totally temporarily disabled, and is in need of continuing psychiatric care. The judge deferred decision on the issues of permanent disability and whether applicant suffered physical injury.

Employer's challenge to the WCAB decision, although couched in a number of specific complaints, is in essence that the evidence is insufficient to support the finding of injury.

■ Our review of an award by the Workers' Compensation Appeals Board is confined to the determination whether, under applicable principles of the law, the award is supported by substantial evidence in light of the entire record. (*LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432]; Lab. Code, § 5952, subd. (d); *Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 664 [150 Cal.Rptr. 250, 586 P.2d 564].)

Labor Code section 5953 provides in part: "The findings and conclusions of the appeals board on questions of fact are conclusive and final and are not subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the appeals board."

Thus, if the board's findings are supported by inferences which may fairly be drawn from evidence even though the evidence is susceptible of opposing inferences, the reviewing court will not disturb the award. (*Riskin* v. *Ind. Acc. Com.* (1943) 23 Cal.2d 248, 254 [144 P.2d 16].)

■ "Nonetheless, even where undisputed operative facts meet the statutory basis of entitlement, a court of review must, as a part of the review in light of the entire record, examine other facts which may seem statutorily irrelevant or inoperative. Such facts may well be relevant and important when the result is examined for fairness, reasonableness and proportionality in the overall scheme of the law and the purposes sought to be accomplished by that law. . . . We simply observe that under *Hale* v. *Morgan*, [22 Cal.3d 388] upon a case-by-case examination (*Id.*, at p. 404), when we discern an inequitable result, it is our duty to require reexamination." (*Universal City Studios, Inc.* v. *Workers' Comp. Appeals Bd.* (1979) 99 Cal.App.3d 647, 658-659 [160 Cal.Rptr. 597].)

*Finding of Psychiatric Injury*

■ Applicant did not originally allege psychiatric injury in the application for adjudication of claim he initially filed with the appeals board. Employer initially argues that since applicant never amended his pleadings to allege injury to his "psyche" the defect in applicant's pleadings precludes a finding of psychiatric injury.

The issue of whether applicant developed a psychiatric condition as a result of his industrial accident was actively litigated by the parties. Both applicant and employer obtained psychiatric evaluations directed towards the questions of whether applicant had a psychiatric condition and whether it was related to the industrial accident.

"Even in a civil case, when an issue has been consciously tried by the parties without objection, it is properly before the court for adjudication even though not formally raised by the pleadings. (*Freeman v. Gray-Cowan, Inc.*, 219 Cal. 85, 87 . . .; *Crescent Lumber Co. v. Larson*, 166 Cal. 168, 171 . . .; 4 Witkin, Cal. Procedure (2d ed. 1971) p. 3138.) In a workmen's compensation proceeding, in which much less formal rules of pleading are observed, the rule should be at least as liberal. (Cf. *Helmuth v. Industrial Acc. Com.*, 59 Cal.App. 160, 162 . . . .)" (*Moyer v. Workmen's Comp. Appeals Bd.* (1972) 24 Cal.App.3d 650, at p. 656 [100 Cal.Rptr. 540].)

In any event the evaluation of applicant's mental state is an integral part, if not the critical part, of this rather unique scenario. We have here an individual who suffered what was apparently a rather minor injury but who makes claims of extreme pain, suffering, and disability. Doctors testifying for both applicant and employer all agreed that applicant exaggerated his symptoms.

Applicant's doctor reported that applicant ". . . is probably the biggest exaggerator of his symptoms that I have ever seen." The doctor, however, attributed this not to malingering but to a psychiatric condition which was the result of the physical injury and the conduct of the employer in failing to view his claim in a sympathic fashion. The doctors for the employer testified that applicant was purely and simply a malingerer.

At the hearing before the workers' compensation judge, applicant presented a picture of a gravely disabled person. He told the judge that he lacked the strength to pick up a glass of liquid, and that in pouring milk from a one-half gallon container, he needed two hands to accomplish the task. Applicant testified variously as follows: "I can't lift anything of any weight. I can't grasp. I tried lifting a bowling ball. . . . I can't lift a bowling ball. . . . When I walk or stand, I still have pain [in the knees] . . . . Medium to severe. . . . The more I stand or walk, the worse it gets."

Employer then produced surveillance motion picture films taken of applicant just a few days prior to the hearing. In that film, applicant is shown playing a round of golf carrying his clubs unassisted by a cart or caddy. This activity obviously involved considerable walking, lifting and grasping.

In finding that applicant has sustained industrial injury to his psyche the workers' compensation judge relied upon the opinion of applicant's doctor. In affirming the judge's decision, the majority of the WCAB panel[1] quoted extensively from the doctor's report and found it "thorough and convincing" support for the trial judge's conclusion that although "applicant was exaggerating his complaints ... [he] is not a conscious faker but rather is suffering from a hypochondriacal psychiatric disorder. ..."

Thus, the judge and the board in essence found that applicant is a "hypochondriac"[2] and a "faker," albeit not a *conscious one*. Such finding of course made it possible for the judge and the board to ignore the surveillance films and the force of our opinion in *Sully-Miller Contracting* v. *Workers' Comp. Appeals Bd.* (1980) 107 Cal.App.3d 916, 926 [166 Cal.Rptr. 111].

The relevant and considered opinion of one physician, even though contradicted by other medical opinions, may constitute sufficient evidence to support a finding of compensable injury. (*Market Basket* v. *Workers' Comp. Appeals Bd.* (1978) 86 Cal.App.3d 137 [149 Cal.Rptr. 872].)

On the other hand, the WCAB may not blindly accept a medical opinion which lacks a solid underlying basis (*Hegglin* v. *Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 162 [93 Cal.Rptr. 15, 480 P.2d 967]; *Universal City Studios, Inc. v. Workers' Comp. Appeals Bd., supra*, 99 Cal.App.3d 647) and must carefully judge its weight and credibility. (*Sully-Miller, supra*, 107 Cal.App.3d 916.)

Accordingly, we must examine the reasoning of the judge and the WCAB in this case in which the finding of psychiatric injury is based

---

[1]The dissenting member of the panel would have appointed an independent medical examiner.

[2]The doctor in his report at no time characterized hypochondria as a "psychiatric disorder."

solely on the testimony of a single doctor who admits that applicant is exaggerating his physical injury.

During his testimony before the judge, applicant made a passing reference to the fact that he had taken a preemployment polygraph examination. None of the details of that examination, i.e., the areas covered or the results, were ever developed.

In his report and recommendation on petition for reconsideration, the judge stated with regard to the polygraph test results: "I find [applicant's doctor's analysis that applicant is not a conscious malingerer] confirmed by the strong inference to be drawn from the apparently empty results of the polygraph test taken by applicant on his application for this job. Had he been found to be a liar *then* he would not have been hired. He was hired, thus he was not lying when he took the polygraph test. He testified here under oath, after having fallen and hurt himself on the job. If he was not a liar when he took the job, it is highly probable that he was not perjuring himself. But he was clearly exaggerating. Why? If he was not lying, he must have been telling the truth as he saw it, whether to objectively oriented minds what he said was exaggerated or no. If he thought he was describing his complaints accurately, but was not lying, then the cause must be a psychologically-caused warping of his perceptions."

We recognize that the WCAB is "not bound by the common law or statutory rules of evidence and procedure." (Lab. Code, § 5708.) And that the WCAB "may make inquiry in the manner, through oral testimony and records, which is best calculated to ascertain the substantial rights of the parties and carry out justly the spirit and provisions of [division 4 of the Labor Code]." (*Ibid.*) However, the WCAB is not totally free of evidentiary rules. (See *Abron* v. *Workmen's Comp. Appeals Bd.* (1973) 34 Cal.App.3d 232 [109 Cal.Rptr. 778]; *Martinez* v. *Associated Engineering & Construction Co.* (WCAB en banc opn. 1979) 44 Cal. Comp.Cases 1012, 1018.)

The evidence upon which the WCAB relies still must have some degree of probative force. (*Simmons Co.* v. *Ind. Acc. Com.* (1945) 70 Cal.App.2d 664, 670 [161 P.2d 702].) After all, substantial evidence only exists where the "'inferences ... may fairly be drawn from evidence.'" (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd., supra*, 22 Cal.3d 658, 664.) Substantial evidence does not exist where the trier of

fact has made a "fanciful conclusion" (*Simmons Co. v. Ind. Acc. Com., supra*, 70 Cal.App.2d 664) or has based the decision on "the creation of nonexistent evidence [or] the creation of a conflict in the evidence which does not otherwise exist." (*Sully-Miller Contracting v. Workers' Comp. Appeals Bd., supra*, 107 Cal.App.3d 916, 926.)

Not only are polygraph test results inadmissible even in WCAB proceedings (see *Aengst v. Board of Medical Quality Assurance*, 110 Cal.App.3d 275, 282-283) but in addition, the mere fact that applicant took such a test and was hired by the employer does not justify the inference that applicant is being truthful about his claim of industrial injury. Such an inference is not a reasonable one no matter how liberal the evidentiary rules are before the WCAB.

Since the judge's decision (and hence the decision of the WCAB) rested on an unreasonable inference from the mere fact applicant took a preemployment polygraph test, we conclude that said decision is unsupported by substantial evidence.

Beyond the judge's faulty segue from the preemployment polygraph to the "persuasiveness" of the doctor's report, we find the doctor's report to be particularly *unpersuasive*, so much so that, as we will point out, it does not constitute the kind of evidence which can be characterized as "substantial."

Perhaps the judge's perception of the weakness in the doctor's report was the reason he felt compelled to rely on the polygraph examination. The fact is that the validity of the doctor's opinion that applicant suffers from a psychiatric disorder rests in toto on the doctor's conclusion that the applicant was not consciously exaggerating or malingering and that the condition was a result of the physical injury rather than a preexisting emotional condition which caused an exaggerated reaction to the injury. This conclusion in turn necessarily rests on the doctor's acceptance of what applicant told him.

In reviewing the doctor's report we first note the doctor's narrative description of applicant's history as follows: "Mr. Kesser's injury was almost two years ago. Since then his life has been characterized by a vast amount of emotional stress and strain. He has had many problems with many areas, all of which are directly attributable to this injury. To begin with, he had problems even getting to a physician who would

treat him on an ongoing basis. Later he had problems with the industrial carrier, who offered him a ridiculously low settlement when he naively tried to represent himself in this litigation, without counsel. Later, he had further problems with the industrial carrier and his employer because he was not receiving the amount of temporary disability income he thought he should be receiving. Even later, and more recently, he has had problems with his carrier because he hasn't received any income at all for the past three months. All during this time he has been *greatly limited in his physical activities.*"

As to the doctor's clinical observations, the report contains the following: "... I never did feel that the patient was being totally candid with me.... He did appear to be in touch with reality.... Regarding his thought processes, he was normal in his form and progression. The content of his speech was markedly hypochondriacal in tone .... There was no obvious psychotic material such as hallucinations, delusions, or ideas of reference. He appeared to be above average in intelligence. He was fully oriented in all spheres. His general fund of knowledge was appropriate to his socio-economic group. He was fully alert and attentive. He was able to abstract proverbs correctly, implying the absence of a formal thought disorder. There was no evidence of recent or remote memory impairment or other signs of organic deterioration.... His social judgment appeared to be adequate.... It is difficult to accurately state the prognosis for Mr. Kesser because I am not truly certain exactly how disturbed he is."

The report continues under the heading "DISCUSSION"

"... It is difficult to state the exact intensity of his post traumatic neurotic reactions to this injury and its residual, it does appear that Mr. Kesser has at *least something going on.* Most specifically, he has been reacting to the *loss of his physical health* and to the abandonment by his employer and its industrial carrier. The loss of his physical health has been especially disconcerting to him because this was one of his high water marks in his life. As a young man he was very athletically prone and competent. His sporting accomplishments were many. *Now he is unable to do anything* and has gained weight as a result.

"The abandonment concept is also important if we are to understand Mr. Kesser's emotional reaction. As a child he literally was abandoned by his parents. His mother died when he was very young, and his father

moved off to Florida. His adolescent years were unhappy ones for him, spent in orphanages and foster homes. I would think that this early developmental history created some abnormal character pathology which was responsible for this man's limited vocational stability throughout life. Now that he is abandoned by his most recent employer, I am sure it stirs up his old memories of parental abandonment. Thus, his losses are significant.

"It would appear that Mr. Kesser is experiencing a post-traumatic of the mixed type as a result of this injury and its sequelae. This neurosis is characterized by a great deal of hostility as its number one clinical presentation. However, associated with it, is a reduction in his self-esteem and security content, which leaves him depressed, anxious and hypochondriacal. This neurosis is entirely industrially related. *This man was working free of psychiatric disability before the injury and there had not been any outside non-industrial causes of stress to account for his emotional deterioration.*" (Italics added.)

Thus we are given the picture of a relatively normal appearing individual who exhibits hostility toward his employer and who exaggerates his symptoms. The doctor concludes that this exaggeration and hostility, because of its intensity and because the doctor determined that there was no *previous* psychiatric or physical disability, is the product of a mental disorder rather than a simple conscious attempt to increase his recovery. Many of the doctor's conclusions are based upon the fact that the applicant apparently told the doctor that he was physically unable to do anything. The statement is of course disproved by the surveillance film.

The doctor's own statements that applicant had a character pathology and that his physical injury was minimal as compared to his subjective complaints, appears to us to be inconsistent with the statement that applicant's problem was related to the injury. In short, we find no solid basis in the report for the doctor's ultimate opinion.

In our opinion, turning exaggeration and malingering into a compensable psychiatric injury on the basis of an *ipse dixit* statement that the malingering was *unconscious* would result in a perversion of the workers' compensation system and is patently unsound.

The WCAB's finding that applicant sustained injury to his psyche as the result of his industrial accident of March 15, 1978, is annulled. The

matter is remanded to the WCAB for further proceedings and decision consistent with our opinion herein.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied August 5, 1981.